## Case No. 746.

### BAILEY et al. v. The SONORA.

[Hoff. Op. 465.]

District Court, N. D. California.   Nov. 28, 1859.

CARRIERS OF PASSENGERS—INSUFFICIENCY OF ACCOMMODATIONS.

[1. A passenger on a steamship, whether in first cabin, second cabin, or steerage, is entitled to such accommodations and conveniences as the exercise of reasonable care and the adoption of reasonable means for securing them can afford.]

[2. Second cabin passengers cannot complain of the discomfort necessarily incidental to a tropical voyage in a second cabin below the first, but they may demand that the number of passengers in the second cabin shall not be greater than it is capable of containing; that every reasonable facility for washing, etc., shall be afforded; that men and women shall not have berths or bunks assigned to them promiscuously, without adequate arrangements to secure privacy; that all proper measures to secure cleanliness, ventilation, etc., shall be adopted; and that the second cabin devoted to the use of passengers shall not be lumbered up with baggage belonging to the other passengers, so as to prevent the free use of the accommodations ostensibly given.]

[See Sparks v. The Sonora, Case No. 13,212.]

[3. In a libel for breach of contract with libelants, as second cabin passengers, it appeared that the vessel was crowded. For 198 second cabin passengers, only two wash basins were provided. Two parallel rows of standee bunks, running fore and aft, were erected in the cabin. Only a few inches of space separated the rows, and the berths in some instances were assigned to persons of different sex and strangers to each other. The voyage was through the tropics, and, as is usual, a large number of the passengers occupied the decks at night; but they were unable to retire until 11 P. M., and were aroused at 3 or 3:30 A. M., when the decks were washed. The mattresses used by these passengers were thrown down the hatchway of the second cabin, materially obstructing ingress and egress. The lower tier of standee berths was taken out, and baggage piled up in its place, in such quantities as to obstruct passage and prevent the proper cleansing of the cabin. From these and other causes, the air of the second cabin rendered its occupation incompatible with comfort, and perhaps with health. The drinking water was so hot as to be unfit for use, except after being cooled with ice, and passengers were charged twenty-five cents per pound for the ice. Held, that though some of the discomforts were to a certain extent incidental to a tropical voyage in a second cabin, the libelants had established a breach of the contract.]

[4. Held, also, that as the discomfort suffered by the women was greater than that experienced by the men, a discrimination should be made in the amount of damages, and that the female passengers should recover the full amount paid for their passage, and the male passengers one-half of that sum.]

[In admiralty. Libel by Bailey and others against the steamship Sonora to recover damages for breach of contract with libelants as passengers. Decree for libelants.]

Robt. Rankin, for libelant.
Hall McAllister, for claimant.

HOFFMAN, District Judge. The libel in this case is filed to recover damages for breach of contract with libellants as passengers. As to the principal facts of the case, the testimony does not leave much room for doubt. The most that can be alleged on the part of the claimants is that the discomforts and sufferings of the passengers, by reason of insufficient accommodations, have been somewhat exaggerated. In a recent case of a similar character, this court had occasion to advert to the extreme difficulty of determining with precision the degree of comfort which the owner of a steamer engaged in the transportation of passengers impliedly agrees to afford. That some inconveniences and discomforts incidental to a voyage in tropical latitudes, and on a steamer conveying passengers in large numbers, must necessarily be submitted to, is obvious. But in the absence of express stipulations, it is not easy to define the character of the accommodations which the passenger has a right to expect, or the degree of discomfort to which he must submit. It may be stated, however, in general terms, that the passenger, whether in first cabin, second cabin, or steerage, is entitled to expect such accommodations and conveniences as the exercise of reasonable care and the adoption of reasonable means for securing them as the owner can afford him. He cannot, of course, expect that the accommodations of the second cabin shall be as good as those in the first; nor that the discomfort necessarily incidental to a tropical voyage in a second cabin, below the first, and filled with passengers, shall be avoided. But he may demand that the number of passengers in the second cabin shall not be greater than it is capable of containing; that every reasonable facility for washing, etc., shall be afforded; that men and women should not have berths or bunks assigned to them promiscuously, without adequate arrangements to secure privacy; that

all proper measures to secure cleanliness, ventilation, etc., should be adopted, and that the second cabin, devoted to the use of passengers, should not be lumbered up with baggage belonging to the other passengers, so as to prevent the free use of the accommodations ostensibly afforded them.

I do not consider it necessary in this case to recapitulate the evidence. It will be sufficient to state the facts which seem to have been clearly established. It appears that the vessel was crowded with passengers, to an extent which, though not so great as on a previous voyage, nevertheless appears to have been greater than was consistent with their comfort, or, probably, with the provisions of the law. It is shown that for 198 second cabin passengers only two wash basins were provided, thus depriving them, and especially the females, of the means of securing personal cleanliness. That two parallel rows of standee bunks, running fore and aft, were erected in the cabin. These rows were separated by a space only a few inches wide—and the berths were in some instances assigned to persons of different sex and strangers to each other. Such an arrangement it was no doubt the desire of the agents of the company to avoid. But it appears to have been made, in this instance, probably owing to the difficulty of properly regulating the matter with so large a number of passengers on board. It appears, that as is usual, a large number of passengers occupied the decks of the vessel at night. It can hardly be alleged that having enjoyed that privilege, they have nothing to complain of—for it is shown that they could not retire until about 11 P. M.; and were aroused in the morning at 3 or 3½ A. M., at which time preparations for washing decks commenced. The mattresses used by these passengers appear to have been thrown down the hatchway of the second cabin, materially obstructing the ingress to and egress from that part of the vessel. It is also shown that the lower tier of standee berths was taken out and baggage piled up in its place —and that this baggage was in such quantities as to obstruct the passage way between the middle and side berths, and in a considerable degree to prevent the proper cleansing of the cabin. It appears that from these and other causes, the air of the second cabin was in such condition as to render its occupation incompatible with comfort, and perhaps with health, a fact which may naturally be inferred from the circumstance that so many of the passengers, and amongst them some women, preferred to sleep on deck on a mattress with no bedding, and where they were compelled to rise every morning at 3 or 3½ A. M. It is also shown that the drinking water furnished to the second cabin during nearly the whole voyage was so hot as to be unfit for use, except after being cooled with ice, and that they were charged twenty-five cents per pound for the ice they obtained for the purpose. The foregoing are the principal matters relied on by the libellants, as showing a breach of their contract.

It is obvious that to a certain extent some of the discomforts complained of were incidental to a voyage of this description, by passengers who had only the right to a second cabin passage. It could not be claimed, for example, that each second cabin passenger should have had a washing basin for his exclusive use; but it might justly be expected that more than two basins would be provided for 198 passengers. That those who occupied the second cabin should suffer some discomfort from foul air, &c., was unavoidable, for a considerable number of passengers could not be placed in a single cabin between decks without being far less agreeably situated than if they had occupied state rooms on the deck above. But they had a right to expect that the floor of their cabin should not be converted into a baggage room for the first cabin baggage; that passengers should not be put in the cabin in such numbers as to make it uninhabitable, and that the number on board the vessel should not be so great as to prevent the ordinary means of ventilation (i. e. opening of port holes) from being available. If standee berths of the construction testified to were to be used, women, at least, had a right to expect that they would not be assigned promiscuously to persons of a different sex. That it may have been necessary to arouse those who slept on the decks at a very early hour for the purpose of washing decks may be admitted; if passengers chose, nevertheless, to occupy the decks, it may be said to have been their own choice to do so. But to make this an available answer to the complaint on this score, it should appear that other accommodations were afforded to such passengers which were as comfortable as their contracts entitled them to claim, and which they could have used without injury to health or exposure to physical suffering. Whatever difference of opinion may exist as to the precise character of the accommodations to which second cabin passengers are entitled on such a voyage, or the degree of discomfort to which they must submit, it must, I think, be conceded that they were at least entitled to a full supply of water fit to drink. It cannot, surely, be claimed to have been a fulfilment of the contract to offer them hot water, which was only palatable after being cooled with ice, which the passengers were obliged to purchase. If it had appeared in this case that every reasonable precaution had been taken, and means adopted to provide for the wants and proper accommodation of the passengers, but that through unforeseen accidents, they had been exposed to more than ordinary annoyances, it might have been urged that such accidents ought not to be regarded as breaches of the passenger contract. But in this case it seems to

me that all the grievances of which they complain can be referred directly or indirectly to the fact that the vessel was overcrowded. The officers, no doubt, did all that lay in their power to promote the comfort of the passengers. But the large number on board rendered their efforts, to a great extent, ineffectual. It is to this cause that we must attribute the confusion which occurred in the assignment of berths—the necessity of stowing the baggage in the second cabin—they take with them good and substantial reasons the inadequate provision for facilities for washing, etc.—and for the same reason, it is testified, it became impracticable to open the port holes and properly ventilate the cabin. It seems to me, therefore, that the grievances complained of must be regarded as breaches of the contract, which the ship could have readily avoided, and for which it should be held responsible.

The amount of damages to be decreed is, necessarily, arbitrary, to a certain extent. No complaint is made as to the provisions furnished the passengers; nor does it appear that sickness prevailed to any considerable extent. No other suffering is shown than that which would necessarily arise from the nature of the accommodations afforded. The passengers arrived in the usual time and in safety. In attempting to estimate the degree of suffering to which, from the various causes mentioned, the passengers were subjected, it is, I think, evident that to the women it must have been greater than to the men. I think, therefore, that a discrimination should be made in the amount of the damages to be awarded. I shall decree to the female libellants the sum admitted in the answer to have been paid by them respectively for their passages on the Sonora, and to each of the men one-half that sum. A decree to this effect must be entered.